1  STEPHEN YAGMAN (SBN 69737)
   filing@yagmanlaw.net
2  YAGMAN + REICHMANN, LLP
   333 Washington Boulevard
3  Venice Beach, California 90292-5152
   (310) 452-3200
4
   Presented on behalf of Plaintiff,
5  BENJAMIN SCHONBRUN

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11 | BENJAMIN SCHONBRUN,          | 2:21-cv-07189-VAP(MRWx)

12 |         Plaintiff,

13 |            v.

14 | SNAP, INC. (formerly known as
   | Snapchat); CNA FINANCIAL
15 | CORPORATION, CONTINENTAL      | FIRST AMENDED COMPLAINT
   | CASUALTY COMPANY;             |        (11/26/21)
16 | HANASAB INSURANCE
17 | SERVICES, INC.;ERIC MICHAEL
   | GARCETTI and MICHAEL          |      JURY DEMAND
18 | JOSEPH BONIN, both in their
19 | official and individual capacities; and
20 | UNKNOWN NAMED
   | DEFENDANTS 1-10,
21
22 |         Defendants.

23

24      Plaintiff makes the following allegations, on information and belief, in

25 support of this Complaint:

26                 **JURISDICTION AND VENUE**

27      1.  Plaintiff asserts diversity of citizenship claims against defendants as

28 defendants and plaintiff are citizens of different states and therefore this court has

jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), since the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; plaintiff also asserts his state law claims based on supplemental jurisdiction, under 28 U.S.C. § 1367; plaintiff also asserts jurisdiction based on 28 U.S.C. § 1331, as a federal civil RICO claim is asserted.

2. Defendants did both general business and case-specific business in California, plaintiff is a domiciliary and citizen of the State of New York, the matters that are the bases for this action occurred in Los Angeles County, California, and therefore venue lies in the United States District Court for the Central District of California, and in its Western Division, pursuant to 28 U.S.C. § 1391.

## THE PARTIES

3. Plaintiff is BENJAMIN SCHONBRUN[1] (hereinafter "Schonbrun" or "plaintiff"), and defendants are SNAP, INC. (formerly known as Snapchat); CNA FINANCIAL CORPORATION; CONTINENTAL CASUALTY COMPANY; HANASAB INSURANCE SERVICES, INC.; ERIC MICHAL GARCETTI[2] and MICHAEL JOSEPH BONIN[3], each sued in both their individual and official capacities[4]; and, UNKNOWN NAMED DEFENDANTS 1-10, (hereinafter, all collectively, "defendants"), and Unknown Named Defendants 1-10, who are persons and/or entities whose true names presently are unknown and who may

---

[1] Plaintiff Schonbrun presently owns all of the right, title, and interest in the subject property, both in his own right and as an assignee of the lease with Snapchat and the contract of insurance with both CNA and Continental Casualty Co., and plaintiff is the sole owner of all the causes of action and claims set forth herein.

[2] A damages claim duly and timely was submitted to the City of Los Angeles.

[3] *Ibid.*

[4] *Ibid.*

have engaged in some of the 5conduct that is culpable with respect to plaintiff, as set forth hereinbelow.

## ALLEGATIONS COMMON TO EACH COUNT

4.  Each and every allegation set forth in each and every averment of this pleading hereby is incorporated by this reference in each and every other averment and allegation of this pleading.

5.  On Nov. 7, 2016, Plaintiff, Lessor, and Defendant SNAP, Inc., Lessee, entered into a written Standard Industrial/Commercial Single Tenant Lease -Net[5], contract, whose terms are set forth in full in Exhibit 1 hereto, which and whose terms hereby are incorporated herein by this reference, whose term was March 27, 2017 to March 27, 2022. By the lease, SNAP legally stepped into the lessor's shoes, and specifically assumed all legal responsibility for the protection of the premises, including against the acts of third parties.

6.  At the time of entry into this agreement, Defendant SNAP agreed to lease from plaintiff the premises known as 723 Ocean Front Walk, Venice, California 90291, for the period March 28, 2017 to March 27, 2022, and to insure[6] and to indemnify plaintiff and the subject premises, as set forth in that contract.

6.  In Sept. 2018, SNAP vacated the premises and ceased maintaining the premises, as it was obligated to do under the lease agreement, thus abandoning

---

[5] A "triple net lease," as here, is a contract for the lease of real property whereby the tenant, here, SNAP, promises to pay all of the expenses of the leased property, including real estate taxes, building insurance premiums, and building maintenance, in addition to all costs of rent and utilities.

[6] Immediately after the fire, plaintiff contacted Mark Prochilo of SNAP to obtain a copy of the insurance policy their agreed to purchase for the building, but SNAP never has provided any such policy from SNAP.

3

both the premises and its legal duties and responsibilities under the terms of the lease contract.

7.  Under the terms of the lease contract, SNAP had legal duties and responsibilities, *inter alia*, which it breached, at least as follows:

8. >6.1[7].  Use:  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste, or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.

9. >7.  Maintenance; Repairs  Lessees Obligations:  Lessee shall at Lessee's sole expense in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by [¶] 7.1 below Lessee shall during the term of the lease, keep the exterior appearance of the building free from graffiti consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity

10.  SNAP breached its duty to keep the exterior of the building free from graffiti.

11. SNAP duly was notified of this breach, and failed and refused to cure it, and would paint over the graffiti with paint that did not match the surrounding exterior paint color, thus further, itself, defacing the building.

12. Under the terms of the lease contract, SNAP also had legal duties and responsibilities, *inter alia*, which it breached, as follows:

13. >8.2 Liability Insurance: SNAP has refused to provide the insurance policy information, and also failed to comply with the term of the lease contract

---

[7] The numbers used to identify the duties had and which were breached refer to the numerical clauses in the lease agreement.

that required SNAP properly and for adequate amounts to insure the premises, to protect both the Plaintiff's interests and itself.

14. >8.2(a)  Carried by Lessee.  Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured, insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $5,000,000 per occurrence with an annual aggregate of not less than $10,000,000.  SNAP did not maintain these levels of coverage, thereby materially breaching the lease agreement.

15. >41  Security Measures:  Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

16.  On Jan. 13, 2021, the unoccupied and abandoned, by SNAP, building burned down.

17.  A cause of the conflagration was that the homeless encampment that was permitted to exist and remain both adjacent to the building and on the curtilage of the building by Defendants SNAP, GARCETTI, and BONIN, and some UNKNOWN NAMED DEFENDANTS, and some acts of the encampment's inhabitants contributed to causing the fire that burned down the building, and the building was a total loss.

18. Defendants CNA and CONTINENTAL CASUALITY COMPANY both issued a policy of insurance that insured the building. Exhibit 2 hereto.

19. The building was seriously under-insured, for which defendants SNAP, CNA, CONTINENTAL CASUALTY, and HANASAB INSURANCE SERVICES, INC. each and all, principally, jointly, and severally, all are liable.

5

20. SNAP is liable for all of plaintiff's out-of-pocket costs and expenses, including plaintiff's servicing of plaintiff's bank loans and the construction costs, to build out the property to its highest and best uses.

21. In about June 2020, the fire insurance on the building had a policy limit of $1.45 million, to replace the building.

22. At that time, plaintiff requested from defendant HANASAB that the policy coverage limit be increased to $5,000,000.00.

23. HANASAB stated, that CNA stated, that the replacement value was $1.85 million, but that it would insure the building for *$2 million.*

24. Within seven months, the building burned down, and CNA then informed plaintiff that it would cost *$2.5 million* to replace the building.

25. CNA's adjuster admitted to plaintiff that *$2.5 million was insufficient* to replace the building.

26. Both CNA and HANASAB were negligent and acted in bad faith in providing (under-) coverage of only $2 million.

27. Defendants GARCETTI and BONIN were on multiple due notices regarding the homeless encampment on the curtilage of, adjacent to, and abutting the building, but they refused and failed to take any action to alleviate that encampment, which constituted both a private and a public nuisance.

28. Once SNAP had abandoned the building, SNAP ceased having their private security force/patrol keep the building safe and secure, ceased enforcing the "No Trespassing" signs, and thus materially breached the lease agreement.

29. SNAP permitted a homeless encampment to begin and to continue on the curtilage of, immediately adjacent to, and abutting the building, and SNAP took no action to keep the building safe, and the homeless encampment became more entrenched and permanent, and its occupants began to secure their tents and

6

other belongings to the ground floor bars (over, and protecting the windows of the building), with bungee cords and in other manners.

30. Plaintiff regularly notified Defendants SNAP, GARCETTI, and BONIN, and the LAPD, of the matters set forth hereinabove, with respect to the homeless encampment and its potential negative consequences to the building, all to no avail.

31. Defendants, except the , GARCETTI and BONIN, did not intend properly and adequately to insure or to indemnify plaintiff.

32. These defendants' representations that they would insure were materially false, were intended to be misleading, were misleading, it was intended that plaintiff would rely on them, plaintiff did rely on them, and all of this caused plaintiff to be harmed and damaged.

33. In reliance on these defendants' representations, plaintiff entered into both the lease with SNAP and the contracts of insurance with CNA, CONTINENTAL, and HANASAB, and paid insurance premiums to CNA and commissions to HANASAB.

34. Plaintiff timely reported a policy claim to defendants CNA and HANASAB.

35. These defendants failed and refused properly and timely to pay plaintiff's claims at their full value, and to indemnify plaintiff for all of the losses, and their attendant consequences to plaintiff.

36. Plaintiff  was injured and damaged by these defendants' failures and refusals to pay the full value of plaintiff's claims.

37. At the time that the non-City defendants entered into the contracts with plaintiff, defendants knew that their representations, both in the lease and to insure and to indemnify plaintiff, were false.

38. Defendants intended to induce plaintiff to enter into the lease contract and the contract of insurance, so that plaintiff would lease the property and pay the insurance premiums to defendants.

39. Plaintiff reasonably and detrimentally relied on these defendants' representations that defendants would carry out the lease provisions, insure plaintiff's interests, and indemnify plaintiff, were plaintiff to incur a covered loss.

40. Plaintiff was harmed both by his reliance on defendants' misrepresentations and by plaintiff causing money to be paid to defendants, the insurance premiums, as well as by defendants refusing to pay for the covered loss.

41. When plaintiff filed his claim of loss, defendants made further misrepresentations that they would pay and indemnify for the loss, and then failed and refused to do so, thus inducing plaintiff not to file sooner the instant action, and thereby further damaged plaintiff's interests in the use of his funds, and the time-loss value of his funds.

42. Having devised or intending to devise a scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations, or promises, defendants, other than the City defendants, transmitted or caused to be transmitted by means of wire and/or United States mails[8], in interstate commerce, writings and words for the purpose of executing their scheme or artifice, as follows:

43. Plaintiff is ignorant of the names of the persons who made these transmissions, except that he knows they were issued by the non-City defendants as companies.

---

[8] All events are by wire and/or mail unless indicated to have been by telephone.

44. Pursuant to Cal. Civ. Code § 2338, all defendants who are principals are responsible to plaintiff for any tortious conduct, both willful and negligent, of their agents, to fulfill the obligations of such principal.

45. Pursuant to Cal. Civ. Code § 2343, all defendants who are agents and who assume to act as agents are responsible to plaintiff as is their principal for her or his acts in the course of such agency, when with her or his consent, credit is given to her or him personally in a transaction, and when she or he enters into an agreement in the name of her or his principal, without believing, in good faith, the she or he has authority to do so, or when her or his acts are wrongful in nature.

46. Pursuant to Cal. Gov't Code § 815.2, all public entity defendants, *i.e.* defendants GARCETTI and BONIN, in their official capacities, are liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of her or his employment if the act or omission would, apart from this Section, have given rise to a cause of action against that employee or her or his personal representative.

47. Pursuant to Cal. Gov't Code § 820, a public employee is liable for injury caused by her or his act or omission to the same extent as a private person.

48. Pursuant to Cal. Gov't Code § 835, a public entity is liable for injury caused by a dangerous condition on its property if a plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that a negligent or wrongful act or omission of an employee of the public entity within the scope of her or his employment created the dangerous condition or the public entity had actual or constructive notice of the dangerous condition under § 835.2, a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

49. Pursuant to Cal. Gov't Code § 840.2, an employee of a public entity is liable for injury caused by a dangerous condition of public property if the plaintiff establishes that the property of the public entity was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either the dangerous condition was directly attributable wholly or in substantial part to a negligent or wrongful act of the employee and the employee had the authority and the funds and other means immediately available to take alternative action which would not have created the dangerous condition, or the employee had the authority and it was her or his responsibility to take adequate measures to protect against the dangerous condition at the expense of the public entity, and the funds and/or other means for doing so were immediately available to her or him, and she or he had actual or constructive notice of the dangerous condition under § 840.4 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

50. Plaintiff's state law claims are asserted as both diversity jurisdiction and supplemental claims, under 28 U.S.C. § 1367.

51. Having devised or intending to devise a scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations, or promises, defendants transmitted or caused to be transmitted by means of wire and/or United States mail[9] in interstate commerce writings and words for the purpose of executing their scheme or artifice.

52. All acts and/or omissions perpetrated by each defendant were engaged in fraudulently, coercively, maliciously, callously, oppressively, wantonly,

---

[9] All events are by wire and/or mail unless indicated to have been by telephone.

recklessly, with deliberate indifference to the rights allegedly violated, despicably, and with evil motive and/or intent, and in disregard of the rights of plaintiff.

53. After the fire, on Jan. 13, 2021, plaintiff was contacted by one Scott Benedict, who identified himself as the CNA adjuster who would handle plaintiff's claims.

54. Thereafter, all claims payments were made by CNA to plaintiff, and mailed to plaintiff at his New York City residence address.

55. Plaintiff deposited all claim related payments from CNA into his bank account entitled "723 Ocean Front Walk LLC," of which plaintiff is the sole, 100% owner.

56. Plaintiff bargained with SNAP for more insurance coverage than it purchased, and SNAP breached clause 8.2(a) of its lease contract with plaintiff by failing and refusing to purchase the insurance coverage for which plaintiff bargained, of $5,000,000 per occurrence with an annual aggregate of not less than $10,000,000.

57. SNAP also breached clause 41 of the lease, regarding security measures, because it assumed all responsibility for the protection of the premises from third parties, and abandoned the premises for more than a year prior to the Jan. 13, 2021 fire, and provided no security for the premises, so that the homeless encampment set up immediately on plaintiff's property and curtilage outside the building, which was not on public space.

58. SNAP breached the lease by not properly painting over and repairing graffiti.

59. SNAP breached the lease by failing to post no trespassing signs on the building.

60. SNAP knew or should have known that the persons in the homeless encampment were using the metal bars over the windows of the building to attach

their tents to, which was a trespass against which SNAP did not protect, thereby breaching the lease.

61. SNAP failed to obtain law enforcement assistance to remove the bungee cords from their attachments to the building and to move the tents to public space.

62. Exhibits 2 and 3 hereto, whose contents are incorporated herein by this reference, demonstrate that Defendant CNA contracted with plaintiff to provide insurance coverage and therefore properly is a party defendant in this action.

## COUNT 1
### (Breach of Written Agreement)

63. By doing the things alleged hereinabove, defendants SNAP, CNA, and HANASAB materially breached their various written agreements with plaintiff, plaintiff was injured and damaged by defendants' breaches, and plaintiff is, therefore, entitled to recover damages from these defendants, and each of them, for breach of a written agreement.

## COUNT 2
### (Fraud)

64. By doing the things alleged hereinabove, defendants SNAP, CNA, and HANASAB committed fraud, both fraud in the factum and fraud in the treaty, by making material misrepresentations that were false that plaintiff properly was insured and that, were plaintiff to make a valid claim on his policies of insurance, that such claims would be paid, they intended plaintiff to rely on those misrepresentations, plaintiff justifiably relied on them, plaintiff was harmed and damaged by his reliance, and these defendants, therefore, are liable to plaintiff for damages for tortious breach of written agreement.

65.-99. Reserved.

## COUNT 4
### (Insurance Bad Faith)

100. By their conduct, all of the non-City defendants engaged in a scheme of insurance bad faith.

12

101.  By doing and failing to do each of the things set forth hereinabove, these defendants each and all breached their duties of good faith and of fair dealing to plaintiff, and thereby injured and damaged plaintiff.

102.-199.  Reserved.

## COUNT 5
### (Nuisance)

200.  California has defined a public nuisance as "[a]nything which is injurious to health, including, but not limited to . . . an obstruction of the free use of property, so as to interfere with the comfortable enjoyment of life and property, or [which] interfere[s] with the comfortable enjoyment of life or property, in the customary manner, of any . . . street, or highway, is a nuisance," and which affects the entire community or neighborhood and/or a considerable number of persons, and plaintiff suffered a special injury over and above that suffered by the general public.

201.  A nuisance claim "is plainly aimed at protecting the public," including plaintiff, "from the hazards created by public nuisances," and a public nuisance is the substantial, unreasonable interference with a public right, and the homeless encampment described hereinabove was a public nuisance, as defined by Cal. Civ. Code § 3479.

202.  As set forth hereinabove, defendants GARCETTI, BONIN, and SNAP, by their failures to maintain the public property under their control -- the sidewalks and public property around, adjacent to, and abutting plaintiff's property, perpetrated, condoned, ratified and supervised a public nuisance, and facilitated public nuisance violations.

203.  The acts and omissions of these defendants were knowing, intentional, and unreasonable, or unintentional but negligent and/or reckless, and the sidewalk condition permitted to exist was the result of their conduct or omissions and/or was an abnormally dangerous activity which substantially interfered with

13

plaintiff's right to use and to enjoy his property, so that any ordinary person would be reasonably annoyed by or disturbed by.

204.  Plaintiff experienced a substantial and unreasonable interference with his rights, by reason of its physical conditions adjacent to his property, and was prevented from using his own property, over which these defendants had control, and has suffered and continues to suffer, and continues to be threatened with respect to his welfare and safety, by reason of these defendants' wrongful conduct, and plaintiff has been injured and damaged, and continues to be injured and damaged, and plaintiff did not consent to these defendants' acts and/or omissions.

**COUNT 6**
(Violation of California Environmental Quality Act ("CEQA"), against Garcetti and Bonin)

205.  The California Environmental Quality Act, Cal. Pub. Res. Code § 21001(d) ("CEQA") requires that local governments must consider environmental implications of their actions in order to "[e]nsure that long term protection of the environment . . . shall be the guiding criterion in public decisions."

206.  CEQA may be applied to sidewalks in California, and a decision not to ameliorate a bad condition on a sidewalk is a part of a discretionary project that is proposed to be carried out or approved by a public agency with jurisdiction thereof.

207. A decision not to repair a project -- here, sidewalk and public areas, requires governmental approval, and a CEQA approval was required for defendants GARCETTI and BONIN to permit the homeless encampment outside plaintiff's building to continue.

208. By their actions and/or omissions, defendants GARCETTI and BONIN failed to ensure the protection of the environment and ignored the legal fact that environmental protection should have been and should be the guiding criterion of

14

their public decisions, to leave in its un-repaired condition the sidewalk outside plaintiff's building.

209.-240.  Reserved.

### COUNT 7
#### (Racketeer Influenced and Corrupt Organizations, RICO, 18 U.S.C.  § 1961, *et seq.*)

241.  By doing the things alleged hereinabove, the non-City defendants thereby committed wire fraud and mail fraud, by using instrumentalities of interstate commerce to accomplish their crimes, and thereby are liable under the civil RICO statutes.

242.  Each defendant, in its own right, and all defendants are, together, collectively, as well as their employees, who work in and for each defendant company, both enterprises and associated-in-fact enterprises, within the meaning of 18 U.S.C.  § 1961(4), and therefore are RICO enterprises.

243.   As regards the dealings alleged in the instant action, each different company is, and the companies that are defendants together are, an enterprise(s), within the meaning of 18 U.S.C. § 1961(4).

244.  Each company defendant's activities affect interstate commerce.

245.  Each defendant received income, directly and/or indirectly, by way of insurance premiums, salary, compensation, reimbursement for expenses, *per diem* costs reimbursements, meals, lodging, and/or travel, *etc.,* from the pattern of racketeering activity alleged herein and used that income in the acquisition of an interest in and/or operation of the enterprise, in violation of 18 U.S.C. 1962(a), and acquired and/or maintained control over said racketeering enterprise through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. 1962(b).

246.  Defendants conducted and/or participated in said enterprises' affairs through a pattern of racketeering activities, in violation of 18 U.S.C. § 1962(c).

247.  The pattern of racketeering activities included a continuous pattern and practice potentially involving activities, including any potential civil RICO predicates, set forth in the RICO predicate statutes, including extortion, mail fraud, wire fraud, fraudulent concealment, fraud, and potentially obstruction of justice, and defendants' defense of the instant action is a continuation and a part of its RICO schemes.

248.  On information and belief, the enterprises' activities have occurred on more than one and on many occasions over at least the past 10 years and have been done on numerous occasions and constitute at least two separate acts, as set forth hereinabove, not including the acts included as part of the defense of the instant action that have not yet occurred.

249.  The wrongful acts described in the matters enumerated hereinabove occurred over a significant period of time, and are related in that they evidence civil RICO predicates, including at least fraud, wire fraud, mail fraud, and obstruction of justice, and they pose a threat of continued criminal activity, have the same or similar purposes, results, participants and kinds and categories of participants, victims, methods of commission, and are otherwise interrelated by their common characteristics, are not isolated events, and each and all constitute a continuing pattern of racketeering activity and constitute a long term threat of continuing racketeering activity.

250.  These wrongful acts over a period of years and the bad acts alleged hereinabove enabled defendants to acquire and maintain, both directly and indirectly, interests in and control of the racketeering enterprises in which they engage.

251.  The activities led to defendants' control and acquisition over the enterprises and resulted in the injuries to plaintiff, as alleged herein, which resulted from defendants' participation in and control of the enterprises.

252.  By failing to prevent the wrongful conduct herein alleged, misconduct that amounted to racketeering activities, all managerial and non-managerial employees and/or officers of defendants engaged in and condoned racketeering activities, and perhaps their attorneys in the instant action, and when the names of the managerial and non-managerial persons, presently Unknown Named Defendants are obtained, the names of those persons will be added as defendants.

253.  The willful and/or negligent mismanagement of the enterprises , with knowledge by defendants charged with management and potentially other defendants that they were and continue to be operated as a RICO enterprises, directly caused the harm to plaintiff, as alleged herein.

254.  The acquisition of control of the enterprises by its participants who engaged in RICO predicate acts harmed plaintiff.

55. The enterprises are RICO enterprises because they have hierarchical structures and consensual structures for making decisions, and those structures have an existence beyond that which is necessary to commit the RICO predicate acts alleged herein, in that the hierarchical and consensual structures exist to accomplish doing business, and the structures for decision-making exist separate and apart from the racketeering activities.

256.  Plaintiff was harmed in that his property, to wit, his building, his money and money in which he had an interest, was subjected to, affected by, and its value affected negatively by defendants' wrongful conduct, including fraud, wire fraud, mail fraud, deception, and obstruction of justice.

257.  Both directly and indirectly, defendants, in the acts and instances alleged herein, and others, have conducted the RICO enterprises' affairs and have, as a matter of fact, participated in the operation and *de facto* management of the RICO enterprises.

258. By the conduct alleged herein, each defendant participated in the operation and management of the RICO enterprises herself and/or himself and/or itself, or played some part in directing their affairs.

259. Plaintiff was injured in his property by reason of the conduct against him, as set forth hereinabove.

260. Plaintiff has suffered a material diminution in the value of his property, to wit, his building, his money, or money in which he had an interest.

261. Defendants unlawfully engaged in the racketeering activities set forth in the preceding averments and, on information and belief, on other occasions during the past 10 years, through a pattern of racketeering activity, and acquired, directly and indirectly, control of the enterprises.

262. Defendants and others, who either are or have been employed by or who are associated with the racketeering enterprises, have conducted those enterprises through a pattern of racketeering activity, as set forth hereinabove.

263. Through a pattern of racketeering activities, as set forth hereinabove, defendants acquired and/or maintained, directly and/or indirectly, interests in and/or control of the RICO enterprises and their activities by, among other things, their own aggrandizement that flows therefrom.

264. By virtue of the allegations set forth hereinabove, some defendants were or are employed by, all defendants were or are associated with, and all defendants participated in, directly and/or indirectly, the RICO enterprises.

265. Defendants unlawfully conspired with others to violate the provisions of 18 U.S.C. § 1962(b), (c), and (d), and, on information and belief, continued to do so with the aid and assistance of co-conspirators

266. Plaintiff was injured in his property by reason thereof, and plaintiff is entitled to damages, to be trebled.

267.  The wrongful policies and practices of defendants relating to the solicitation, sale, and processing of policies of insurance include, but are not limited to, the deliberate failure to make honest and truthful disclosures and of making material misrepresentations, and have been formulated and implemented by defendants, both singly and jointly.

268.  Defendants' actions involve thousands of consumers and constitute a pattern of racketeering activity and the predicate acts of wire fraud and mail fraud, in violation of 18 U.S.C. § 1343.

<div align="center">

**COUNT 8**
(Insurance Bad Faith, Conspiracy)

</div>

269.  By their conduct, the non-City defendants engaged in a scheme of insurance bad faith, and conspired to do so, by having an agreement and/or understanding to accomplish the wrongful things alleged herein.

270.  By doing and failing to do each of the things set forth hereinabove, defendants each and all breached their duties of good faith and of fair dealing to plaintiff and thereby injured and damaged plaintiff, by conspiring to do so.

<div align="center">

**COUNT 9**
(Fraud by Concealment)

</div>

271.  By their actions as set forth hereinabove, defendants SNAP, CNA, and HANASAB engaged in fraud by concealment.

<div align="center">

**COUNT 10**
(Constructive Fraud)

</div>

272.  Fiduciary relationships were established between plaintiff, on the one hand, and defendants SNAP, CNA, and HANASAB, on the other hands, for the purposes of properly providing security for the building (SNAP) and insuring the subject property (SNAP, CNA, and HANASAB), and under those fiduciary relationships, these defendants thereby owed fiduciary duties of care, loyalty, and

good faith to plaintiff and, among other things to treat plaintiff with reasonable diligence and act in plaintiff's best interests.

273.  Plaintiff duly relied on these fiduciary relationships and their requirements, and had plaintiff been informed of or and aware of these defendants' misfeasances, plaintiff would have terminated  his relationships and obtained different persons with whom to do business, and to provide security to the building and insurance for the building.

274.  These defendants' non-disclosures of their not having provided sufficient security for the building and of not providing sufficient and appropriate insurance coverage for the building proximately and substantially caused plaintiff to suffer significant harm in an amount in excess of $75,000, excluding interest and costs.

275.  In addition, under the "tort of another" doctrine, plaintiff suffered damages in the form of financial losses, time, attorneys' fees, and other expenditures incurred in consequence of defendants' wrongful conduct, which constitutes constructive fraud.

## COUNT 11
(Aiding and Abetting Others' Acts)

276.  By virtue of all of the wrongful conduct set forth herein, each defendant aided and abetted all of each others' wrongful acts, and each defendant is liable therefor.

## COUNT 12
(Conspiracy)

277.  Each defendants agreed and/or understood all of the things alleged herein to be wrongful, and each and all of them are liable for conspiracy to engage in each others' wrongful conduct, and knowingly and willfully agreed and conspired to damage plaintiff and his legal and economic interests.

278.-299.  Reserved.

## CLASS ACTION ALLEGATIONS

300. Plaintiff is a member of the discrete class of persons whose defining characteristic is that its members were insured under agreements of insurance to insure for and to indemnify against risks of property damage and who were insured by defendants **CNA** and **CONTINENTAL CASUALTY**, who submitted claims on the policies of insurance, who were under-insured, and whose just claims were not paid in the proper amount.

301. This class contains over 100 members, and the class is so numerous so that joinder of all members is impracticable.

302. Because only defendants know the names of all of the members of class and defendants are the only persons who have information sufficient to identify all the members of class it is impracticable to join all the members of the class in this action.

303. There are only common questions of fact and law with respect to all class members, which are whether they are insureds, whether they made claims, and whether their claims were not paid.

304. The claim made by the representative party, plaintiff, is typical of the claims of each class member.

305. The representative of the class, plaintiff, fairly, vigorously, and zealously will represent and adequately protect the interests of all class members.

306. Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to class members, which would establish incompatible standards for parties opposing the class, and defendants have acted and will continue to act on grounds generally applicable to every class member, and the class questions not only predominate but are the only questions that exist.

307. Therefore, this action is maintainable under F.R. Civ. P. Rule 23(a), & (b)(1)(A),(B)(1),(2), and (3).

308. It is not presently possible accurately to measure the size of the class.

309. The nature of the notice to be provided to class members should be as follows:  defendants should be required to identify all insureds whose claims were denied and to provide a suitable notice to all class members.

**WHEREFORE**, plaintiff requests relief against defendant as follows:

1.  General damages to be determined, in a sum exceeding $75,000.00, and of at least $8,000,000.00, exclusive of interest and costs;

2.  Punitive damages in a sum to be determined by a jury, and as a percentage of the net worth and yearly profits of defendants, in a sum sufficient to deter future misconduct, and not less than $10,000,000.00;

3.  The trebling of all damages for the RICO violations;

4.  Costs of suit;

5.  Attorneys' fees, only if there is class certification and Mr. Reichmann appears at the time of certification, for services rendered thereafter;

6.  Interest;

7.  Injunctive relief that defendants properly pay claims that are valid and not refuse to pay claims that are valid and engage only in fair claims practices; and,

8.  Such other relief as is just and proper.

### JURY DEMAND

Plaintiff demands trial by jury of all issues.

**YAGMAN + REICHMANN, LLP**

By: *Stephen Yagman*

**STEPHEN YAGMAN**

# EXHIBIT 1

DocuSign Envelope ID 2AD25B13-8C56-45CD-857D-0640BF559AE5

**AIR COMMERCIAL REAL ESTATE ASSOCIATION**
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1.     Basic Provisions ("Basic Provisions").**
   **1.1   Parties:** This Lease ("Lease"), dated for reference purposes only **November 7, 2016** , is made by and between **BBMS OPW,LLC an undivided 50% interest, L&M Seplow,LLC an undivided 25% interest, & Jabu,LLC an undivided 25% interest, acting as tenants in common** ("Lessor") and **Snap, Inc.**

("Lessee"), (collectively the "Parties," or individually a "Party").
   **1.2   Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as **723 Ocean Front Walk, Venice, 90291** , located in the County of **Los Angeles** , State of **California** , and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project) **A 6,952 square foot office building on an 8,164 square foot lot with 10 parking spaces.**
("Premises"). (See also Paragraph 2)
   **1.3   Term:** _____ years and **61** months ("Original Term") commencing **March 28, 2017** ("Commencement Date") and ending **March 27, 2022** ("Expiration Date"). (See also Paragraph 3)
   **1.4   Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing **February 28, 2017** ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)
   **1.5   Base Rent:** **$49,243.34** per month ("Base Rent"), payable on the **28th** day of each month commencing **March 28, 2017. Base rent to increase three percent (3%) each year on the anniversary of the Commencement Date.** .(See also Paragraph 4)
   ☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _____

   **1.6   Base Rent and Other Monies Paid Upon Execution:**
      (a)   Base      Rent:      $_____      for      the      period _____

      (b)   Security Deposit: **$49,243.34** ("Security Deposit"). (See also Paragraph 5)
      (c)   Association   Fees:      $_____      for      the      period _____

      (d)   Other:   $_____      for _____

      (e)   Total Due Upon Execution of this Lease: $_____ .
   **1.7   Agreed Use:** **General office and any other use allowed by law.**
. (See also Paragraph 6)
   **1.8   Insuring Party:** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)
   **1.9   Real Estate Brokers:** (See also Paragraph 15 and 25)
      ~~(a) Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):~~
~~☐ _____ represents Lessor exclusively ("Lessor's Broker");~~
~~☐ _____ represents Lessee exclusively ("Lessee's Broker"); or ☐ _____ represents both Lessor and Lessee ("Dual Agency").~~
      ~~(b) Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of~~

**PAGE 1 OF 21**

INITIALS                                      INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                   FORM STN-25-09/16E

DocuSign Envelope ID: 2AD25013-BC56-45CD-857D-06405F559AE5

~~of~~ ~~%-of-the-total-Base-Rent)-for-the-brokerage-services-rendered-by-the-Brokers.~~

**1.10  Guarantor.**  The obligations of the Lessee under this Lease are to be guaranteed by

_____ ("Guarantor").  (See also Paragraph 37)

**1.11  Attachments.**  Attached hereto are the following, all of which constitute a part of this Lease:
- ☐ an Addendum consisting of Paragraphs _____ through _____ ;
- ☐ a plot plan depicting the Premises;
- ☐ a current set of the Rules and Regulations;
- ☐ a Work Letter;
- ☐ _____ other _____ (specify):

_____

_____

## 2.  Premises.

**2.1  Letting.**  Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. Note: Lessee is advised to verify the actual size prior to executing this Lease.

**2.2  Condition.**  Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise, (ii) any delinquent amounts due under any loan secured by the Premises  and (iii) any bankruptcy proceeding affecting the Premises.

**2.3  Compliance.**  Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") ~~that-were-in-effect-at-the-time-that-each-improvement-or-portion-thereof,-was-constructed.~~ Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: ~~Lessee-is-responsible-for-determining-whether-or-not-the-Applicable-Requirements,-and-especially-the-zoning,-are-appropriate-for-Lessee's-intended-use,-and-acknowledges-that-past-uses-of-the-Premises-may-no-longer-be-allowed.~~ If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION       FORM STN-25-09/16E

INITIALS                                                     INITIALS

DocuSign Envelope ID: 2AD25B13-BC56-45CD-857D-06408F559AE5

(such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4    Acknowledgements. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

(a)Lessee and Lessor acknowledge that Lessor shall deliver the Premises in as-is condition. All Building systems including but not limited to existing working condition of all mechanical, HVAC, electrical, plumbing, fire suppression and life safety equipment shall be delivered to tenant in good working order and free of defects. Subject to the foregoing, any maintenance or condition repairs of the Premises from Rent Commencement Date through the term of the lease is the Lessee's sole responsibility to repair or maintain, at Lessee's sole cost.

2.5    Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3    Term.
3.1    Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.
3.2    Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.
3.3    Delay in Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.
3.4    Lessee Compliance. Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence,

INITIALS                INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                FORM STN-25-09/16E

DocuSign Envelope ID 2AD25B13-8C58-45CD-B57D-06408F559AE5

Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.   Rent.

4.1.   Rent Defined.   All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2   Payment.   Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar.  In the event that any Invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.  Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month  Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing.  Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check.  Payments will be applied first to accrued late charges, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3   Association Fees.   In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises.  Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.   Security Deposit.   Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease.  If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof.  If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the Increased Base Rent as the Initial Security Deposit bore to the Initial Base Rent.  Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof.  If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.  Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor.  Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied.  No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

6.   Use.

6.1   Use.   Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.  Other than guide, signal and seeing-eye-dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.  Lessor shall not unreasonably withhold or delay its consent to any request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises.  If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use. Lessee shall have access to the Property, twenty-four (24) hours per day, three hundred sixty five (365) days per year.  Lessee shall have the right to install its own security system  at Property.

6.2   Hazardous Substances.

(a) Reportable Uses Require Consent.   The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/15E

DocuSign Envelope ID 2AD25B13-BC56-45CD-857D-0640BF559AE5

constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) Duty to Inform Lessor. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) Lessee Remediation. Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) Lessee Indemnification. Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) Lessor Indemnification. Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) Investigations and Remediations. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) Lessor Termination Option. If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/16E

DocuSign Envelope ID 2AD25B13-8C56-45CD-857D-06406F559AE5

funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3     Lessee's Compliance with Applicable Requirements. Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, which relate to Lessee's use of the Premises ~~the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date~~. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor. In addition, Lessee shall provide Lessor with copies of its business license, certificate of occupancy and/or any similar document within 10 days of the receipt of a written request therefor.

6.4     Inspection; Compliance. Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements by Lessee, or a Hazardous Substance Condition (see paragraph 9.1) caused by Lessee is found to exist or be imminent, ~~or the inspection is requested or ordered by a governmental authority~~. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefore. Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7.     Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.

7.1     Lessee's Obligations.

(a) In General. Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the non-structural portions of the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair ~~(whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises)~~, including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. ~~Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.~~ Lessee shall, during the term of this Lease, keep the exterior appearance of the Building free from in-a-first-class-condition ~~(including, e.g. graffiti removal)~~ consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, ~~including when necessary, the exterior repainting of the Building~~. Lessee shall have no obligation to make any capital repair or replacements including replacement or repairs of any structural components of the Premises, Building and Project, the roof, foundation, floor slab or replacement of any Building systems or any areas outside of the Premises. Lessor shall be responsible for the capital repair or replacement of any such items and the cost of which shall be allocated between] the parties pursuant to Paragraph 7.1(d) below.

(b) Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection. (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) Failure to Perform. If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor

INITIALS

INITIALS     BG  MS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION     FORM STN-25-09/16E

DocuSign Envelope ID 2AD25B13-BC56-45CD-B57D-06406F559AE5

may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

(e) Alterations and Repairs. Lessee shall have the right, at it's own expense, to make (i) non-structural improvements, alterations and/or changes in or to the Property with a value of less than $50,000 per occurrence without Lessor's consent and (ii) structural alterations with Lessor's consent, which shall not be unreasonably withheld or otherwise conditioned or delayed. Lessee shall be responsible for repairs within the Property caused by misuse or neglect and any damage caused by alterations, additions, or changes made by Lessee. Lessor shall be responsible for all other repairs to the Property and the systems thereof.

7.2 **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. Lessor shall be responsible for any capital repair and replacements of the roof, foundation, structure of the Building and any building systems, the cost of which shall be allocated between the parties pursuant to Paragraph 7.1 (d) above. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises.

7.3 **Utility Installations; Trade Fixtures; Alterations.**

(a) Definitions. The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the Improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) Consent. ~~Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life-safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.~~ Lessee shall have the right, at Lessee's sole cost, to 1) Subject to Lessor's reasonable approval, install communication conduit; 2) Subject to Lessor's reasonable approval, install a supplemental A/C system for the purposes of twenty-four (24) hour air-conditioning of its LAN room; 3) Specify, purchase, and utilize its own cosmetic, and/or decorative materials including, but not limited to, floor coverings, paint and wall covering.

(c) Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys'

©2001 · AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/16E

DocuSign Envelope ID: 2AD25B13-BC56-45CD-857D-06408F559AE5

fees and costs.

    7.4    **Ownership; Removal; Surrender; and Restoration.**

    (a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

    (b) **Removal.** By delivery to Lessee of written notice from Lessor ~~not-earlier-than-90-and-not-later-than-30 days-prior-to-the-end-of-the-term-of-this-Lease,~~ later than the date of Lessor's consent, Lessor may require that any or all Lessee Owned Alterations or Utility Installations which are not for general office use be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

    (c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    **Insurance; Indemnity.**

    8.1    **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

    8.2    **Liability Insurance.**

    (a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 $5,000,000 per occurrence with an annual aggregate of not less than $2,000,000 $10,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

    ~~(b) Carried by Lessor. Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition-to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.~~

    8.3    **Property Insurance - Building, Improvements and Rental Value.**

    (a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed a commercially reasonable amount $5,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

ALS
INITIALS

FORM STN-25-09/18E

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4 **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed a *commercially reasonable amount* ~~$1,000~~ per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(d) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5 **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8 **Exemption of Lessor and its Agents from Liability.** ~~Notwithstanding the negligence or breach of this Lease~~ *Except to the extent of the wilful misconduct* by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9 **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the

DS — INITIALS

DS BS MS — INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

DocuSign Envelope ID 2AD25B13-BC56-45CD-957D-06409F559AE5

insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.   **Damage or Destruction.**

   9.1   Definitions.

      (a) "Premises Partial Damage" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

      (b) "Premises Total Destruction" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

      (c) "Insured Loss" shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

      (d) "Replacement Cost" shall mean the cost to repair or rebuild the Improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

      (e) "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

   9.2   Partial Damage - Insured Loss. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the Improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to, (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

   9.3   Partial Damage - Uninsured Loss. If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or wilful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

   9.4   Total Destruction. Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM STN-25-03/15E

DocuSign Envelope ID: 2AD25B13-6C56-45CD-857D-06406F559AE5

negligence or wilful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5   Damage Near End of Term.   If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an insured Loss, Lessor or Lessee may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee the other party within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6   Abatement of Rent; Lessee's Remedies.

(a) Abatement.   In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value Insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) Remedies.   If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   Termination; Advance Payments.   Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.   Real Property Taxes.

10.1   Definition.   As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes), improvement bond, and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address   Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein, (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2   Payment of Taxes.   In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date.   If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated.   In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent.   Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent.   When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes.   If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary.   Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3   Joint Assessment.   If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4   Personal Property Taxes.   Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee.   When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                FORM STN-25-09/16E

DocuSign Envelope ID 2AD25B13-BC56-45CD-B57D-0540BF559AE5

Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

10.5 Proposition 13 Protection. Lessee will not be responsible for any real estate tax increase or escalation that results from the sale or refinancing of the property. ~~any tenant improvements, or the construction of any new building improvements undertaken by Lessee.~~

11. Utilities and Services. Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions

12. Assignment and Subletting.

~~12.1 Lessor's Consent Required.~~

~~(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.~~

~~(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.~~

~~(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.~~

~~(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.~~

~~(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.~~

~~f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.~~

~~(g) Notwithstanding the foregoing, allowing a de-minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.~~

12.1 Right to Sublease and Assign. Without having Lessor's approval, Lessee shall be permitted to sublease or assign all or any portion of the Property, to any related corporate entity or affiliate of Lessee, or in connection with any M&A or IPO transaction, or any financing transaction. In addition, any transfer of stock in Lessee shall not constitute an assignment or other transfer of the Lease ~~provided that it does not reduce the then current net worth of Lessee.~~ Lessee shall retain all profits or losses from sublease or assignment. Lessor shall not have any recapture rights. Any other sublease or assignment shall be permitted subject to Lessor's reasonable approval within 10 days after request from Lessee.

12.2 Terms and Conditions Applicable to Assignment and Subletting.

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

INITIALS                    INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM STN-25-09/15E

DocuSign Envelope ID: 2AD25813-BC56-45CD-857D-0640BF559AE5

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    Additional Terms and Conditions Applicable to Subletting.  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13    Default; Breach; Remedies.

13.1    Default; Breach.  A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee. In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules

INITIALS

PAGE 13 OF 21

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/16E

DocuSign Envelope ID 2AD25B13-BC56-45CD-B57D-06408F559AE5

adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days, or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    Remedies. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach·

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee· (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided, and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises

13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such

©2001 · AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/15E

INITIALS

ALS
INITIALS

DocuSign Envelope ID: 2AD25B13-BC56-45CD-857D-06405F559AE5

Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, Inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges.  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater.  The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest.  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor within 5 days after such amount shall be~when due shall bear interest from the  31st day after it was due. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law.  Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessor.

(a) Notice of Breach.  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor.  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation.  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    Brokerage Fees.

15.1    Additional Commission.  In addition to the payments owed pursuant to Paragraph 1.9 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.

15.2    Assumption of Obligations.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION     FORM STN-25-09/16E

DocuSign Envelope ID: 2AD25B13-BC56-45CD-857D-06408F559AE5

~~when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessee's Broker for the limited purpose of collecting any brokerage fee owed.~~

15.3    Representations and Indemnities of Broker Relationships.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    Estoppel Certificates.

(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.  In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    Definition of Lessor.  The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18    Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    Days.  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    Limitation on Liability.  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    Time of Essence.  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22    No Prior or Other Agreements; Broker Disclaimer.  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.    Notices.

23.1    Notice Requirements.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

DocuSign Envelope ID 2AD25B13-BC56-45CD-857D-0640EF539AE5

Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2   Date of Notice. Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.   Waivers.

(a)   No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)   The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)   THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.   Disclosures Regarding The Nature of a Real Estate Agency Relationship.

(a)   When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)   Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b A duty of honest and fair dealing and good faith c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)   Lessee's Agent. An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations To the Lessee. A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor. a Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)   Agent Representing Both Lessor and Lessee. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii) In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)   Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)   Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION      FORM STN-25-09/18E

DocuSign Envelope ID 2AD25B13-BC56-45CD-B57D-0640BF559AE5

Information given Brokers that is considered by such Party to be confidential.

26. **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Holdover Base Rent shall be calculated on monthly basis. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27. **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28. **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29. **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30. **Subordination; Attornment; Non-Disturbance.**

30.1 **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2 **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership, (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3 **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4 **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31. **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32. **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior with written 24 hour notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

PAGE 19 OF 21

INITIALS

©2001 · AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-03/10E

DocuSign Envelope ID 2AD25813-BC56-45CD-857D-06408F569AE5

33.   **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.   **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.   **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises, provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.   **Consents.** All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach by Lessee, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.   **Guarantor.**

37.1   **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2   **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.   **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.   **Options.** Lessor shall grant Lessee one (1) option to extend the Lease Term, each for an additional one (1) year period   Lessee's base rent during the renewal option period shall be at the then, fair market value rental rate for the Property, defined in the 'case   If Lessee is granted any Option, as defined below, then the following provisions shall apply:

39.1   **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2   **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3   **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4   **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.   **Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the

PAGE 19 OF 21

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/18E

INITIALS

INITIALS

DocuSign Envelope ID 2AD25813-BC58-45CD-857D-06406F559AE5

management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.    **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.    **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.    **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment

44.    **Authority; Multiple Parties; Execution.**

       (a)     If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority

       (b)     If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees. and Lessor may rely on the same as if all of the named Lessees had executed such document

       (c)     This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.    **Conflict.** Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions

46.    **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.    **Amendments.** This Lease may be modified only in writing  signed by the Parties in interest at the time of the modification.  As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.    ~~Waiver of Jury Trial.   THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.~~

49.    **Arbitration of Disputes.**    An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☒  is not attached to this Lease

50.    **Accessibility; Americans with Disabilities Act.**

       (a)     The Premises: ☐ have not undergone an inspection by a Certified Access Specialist (CASp). ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55 51 et seq.

       (b)     Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:

**1.** SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.



PAGE 20 OF 21

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-25-09/16E

DocuSign Envelope ID 2AD25B13-BC56-45C0-857D-05406F559AE5

**2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE. WARNING:  IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.**

ATTACHCE

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: _____ On Executed at: _____ On

| By LESSOR: | | BY LESSEE: | |
|---|---|---|---|
| By: | | By: | |
| Name  Printed | | Name  Printed | |
| Title | | By  Title | |
| | | Name | |
| Printed | | Title. Printed | |
| | | Address | |
| | | | |
| Telephone (___) | | Telephone (___) | |
| Facsimile (___) | | Facsimile (___) | |
| Email | | Email | |
| Email | | Email | |
| Federal ID No | | Federal ID No | |

Snap Inc.
Legal
Approved

**BROKER:**                                         **BROKER:**

| | Attn | | Attn |
|---|---|---|---|
| | Title | | Title |
| | Address | | Address |
| | | | |
| Telephone (___) | | Telephone (___) | |
| Facsimile (___) | | Facsimile (___) | |
| Email | | Email | |
| Federal ID No | | Federal ID No. | |
| Broker/Agent BRE License #: | | Broker/Agent BRE License # | |

**NOTICE:** These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 500 N Brand Blvd, Suite 900, Glendale, CA 91203.
Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-25-09/16E

# EXHIBIT 2



**CNA Connect**

Endorsement Declaration

| | | |
|---|---|---|
| **POLICY NUMBER**<br>B 4030940344 | **COVERAGE PROVIDED BY**<br>CONTINENTAL CASUALTY COMPANY<br>151 N Franklin<br>CHICAGO, IL  60606 | **FROM - POLICY PERIOD - TO**<br>08/15/2020      08/15/2021 |
| | **INSURED NAME AND ADDRESS**<br>723 OCEAN FRONT WALK LLC<br>11543 W. OLYMPIC BLVD<br><br>LOS ANGELES, CA  90064 | |
| **AGENCY NUMBER**<br>052956 | **AGENCY NAME AND ADDRESS**<br>HANASAB INSURANCE SERVICES, INC.<br>625 S. FAIRFAX AVENUE<br>LOS ANGELES, CA  90036<br>Phone Number: (323)782-8454 | |
| **BRANCH NUMBER**<br>240 | **BRANCH NAME AND ADDRESS**<br>LOS ANGELES<br>WEDBUSH CENTER<br>1000 WILSHIRE BLVD 18 FL #1800<br>LOS ANGELES, CA  90017<br>Phone Number: (877)400-0750 | |

This policy becomes effective and expires at 12:01 A.M. standard time at your mailing address on the dates shown above.

This endorsement changes your policy.  Please read it carefully.

The Named Insured is a Limited Liability Company

The Endorsement Premium Is                    $512.00      ADDITIONAL



**Terrorism Risk Insurance Act Endorsement Premium          $17.00        ADDITIONAL**

Audit Period is Not Auditable

INSURED                              Page   1 of   2



**CNA Connect**

Renewal Declaration

| | | |
|---|---|---|
| **POLICY NUMBER** | **COVERAGE PROVIDED BY** | **FROM - POLICY PERIOD - TO** |
| B 4030940344 | CONTINENTAL CASUALTY COMPANY | 08/15/2020    08/15/2021 |
| | 151 N Franklin | |
| | CHICAGO, IL  60606 | |

**INSURED NAME AND ADDRESS**
723 OCEAN FRONT WALK LLC
11543 W. OLYMPIC BLVD

LOS ANGELES, CA  90064

   **REFER TO ADDITIONAL NAMED INSUREDS SCHEDULE**

**AGENCY NUMBER**
052956

**AGENCY NAME AND ADDRESS**
HANASAB INSURANCE SERVICES, INC.
625 S. FAIRFAX AVENUE
LOS ANGELES, CA  90036
Phone Number: (323)782-8454

**BRANCH NUMBER**
240

**BRANCH NAME AND ADDRESS**
LOS ANGELES
WEDBUSH CENTER
1000 WILSHIRE BLVD 18 FL #1800
LOS ANGELES, CA  90017
Phone Number: (877)400-0750

This policy becomes effective and expires at 12:01 A.M. standard time at your mailing
address on the dates shown above.

The Named Insured is a Limited Liability Company

Your policy is composed of this Declarations, with the attached Common Policy Conditions,
Coverage Forms, and Endorsements, if any. The Policy Forms and Endorsement Schedule shows
all forms applicable to this policy at the time of policy issuance.



      The Estimated Policy Premium Is      $3,339.00

**Terrorism Risk Insurance Act Premium**      **$113.00**

Audit Period is Not Auditable

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 4030940344 | 723 OCEAN FRONT WALK LLC |
| | 11543 W. OLYMPIC BLVD |
| | LOS ANGELES, CA  90064 |

**PROPERTY COVERAGE**                                        **LIMIT OF INSURANCE**

The following deductible applies unless a separate deductible is shown on the Schedule of Locations and Coverage.

Deductible:     $1,000

| Business Income and Extra Expense Coverage | |
|---|---|
| Business Income and Extra Expense | 12 Months Actual Loss Sustained |
| Business Income and Extra Expense - Dependent Properties | $10,000 |
| Employee Dishonesty | $25,000 |
| Forgery and Alteration | $25,000 |

**LIABILITY COVERAGE**                                        **LIMIT OF INSURANCE**

| | |
|---|---|
| Liability and Medical Expense Limit - Each Occurrence | $2,000,000 |
| Medical Expense Limit -- Per Person | $10,000 |
| Personal and Advertising Injury | $2,000,000 |
| Products/Completed Operations Aggregate | $4,000,000 |
| General Aggregate | $4,000,000 |
| Damage To Premises Rented To You | $300,000 |
| Employment Practices/Fiduciary Liability  Retroactive Date:  08/15/2011 EPLI Deductible: $0 | $10,000 |
| Hired Auto Liability | $1,000,000 |
| Nonowned Auto Liability | $1,000,000 |

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 4030940344 | 723 OCEAN FRONT WALK LLC |
| | 11543 W. OLYMPIC BLVD |
| | LOS ANGELES, CA  90064 |

## SCHEDULE OF LOCATIONS AND COVERAGE

**LOCATION    1  BUILDING    1**

723 OCEAN FRONT WALK
VENICE, CA    90291

Construction: Frame

Class Description: Lro - Office Occupants

Inflation Guard 3%

| PROPERTY COVERAGE | LIMIT OF INSURANCE |
|---|---|
| Accounts Receivable | $25,000 |
| Building | $1,520,123 |
| Business Personal Property | Not Covered |
| Electronic Data Processing | $50,000 |
| Equipment Breakdown | $1,520,123 |
| Fine Arts | $25,000 |
| Ordinance or Law - Demolition Cost, Increased Cost of Construction | $25,000 |
| Seasonal Increase: 25% | |
| Sewer or Drain Back Up | $25,000 |
| Valuable Papers & Records | $25,000 |



| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 4030940344 | 723 OCEAN FRONT WALK LLC |
| | 11543 W. OLYMPIC BLVD |
| | LOS ANGELES, CA  90064 |

## MORTGAGEE SCHEDULE

**LOCATION**   1   **BUILDING**   1

**MORTGAGEE NAME AND ADDRESS:**

CITY NATIONAL BANK
8315 DOUGLAS STREET, #100
EL SEGUNDO            , CA 90245
**LOAN NUMBER:**

**MORTGAGEE NAME AND ADDRESS:**

US SMALL BUSINESS ADMIN. C/O CALIFORNIA STATEWIDE CDC
426 D ST
DAVIS                , CA 95616
**LOAN NUMBER:**

**MORTGAGEE NAME AND ADDRESS:**

CITY NATIONAL BANK
8315 DOUGLAS STREET, #100
EL SEGUNDO            , CA 90245
**LOAN NUMBER:**

## LOSS PAYEE SCHEDULE

All loss payees as their interests may appear in the Covered Property.

The following provisions apply in accordance with the insurable interest of the loss payee: Loss Payee

Description of Property: Any Covered Property in which a loss payee, creditor or lender holds an interest, including any person or organization you have entered a contract with for the sale of Covered Property.

**POLICY NUMBER**      **INSURED NAME AND ADDRESS**
B 4030940344           723 OCEAN FRONT WALK LLC
                       11543 W. OLYMPIC BLVD
                       LOS ANGELES, CA 90064


**ADDITIONAL NAMED INSUREDS SCHEDULE**

L&M SEPLOW, LLC

BBMS OFW LLC

JABU, LLC



INSURED                                     Page 5 of 7

```
POLICY NUMBER              INSURED NAME AND ADDRESS
B 4030940344               723 OCEAN FRONT WALK LLC
                           11543 W. OLYMPIC BLVD
                           LOS ANGELES, CA  90064
```

## FORMS AND ENDORSEMENTS SCHEDULE

The following list shows the Forms, Schedules and Endorsements by Line of Business that are a part of this policy.

**COMMON**

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| CNA79203XX | 06/2014 | Exclusion - Access or Disclosure of Confidential |
| CNA80103XX | 09/2014 | Primary and Non Contributory - Other Ins Condition |
| CNA81751XX | 03/2015 | Cap on Losses from Certified Acts of Terrorism |
| CNA85710XX | 06/2016 | Unmanned Aircraft Exclusion Endorsement |
| SB146916D | 12/2019 | California Changes |
| SB147075A | 01/2006 | Economic and Trade Sanctions Condition |
| SB147082E | 04/2014 | Businessowners Common Policy Conditions |
| SB147086B | 04/2010 | Loss Payable Provisions |

**COMMERCIAL PROPERTY**

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146801I | 04/2014 | Businessowners Special Property Coverage Form |
| SB146802E04 | 06/2016 | Business Income and Extra Expense |
| SB146803A | 01/2006 | Seasonal Increase |
| SB146804A | 01/2006 | Arson and Theft Reward |
| SB146805B | 06/2016 | Claim Data Expense |
| SB146806B | 01/2008 | Debris Removal |
| SB146807E | 06/2016 | Employee Dishonesty |
| SB146808A | 01/2006 | Expediting Expenses |
| SB146809C | 07/2009 | Fine Arts |
| SB146810A | 01/2006 | Fire Department Service Charge |
| SB146811A | 01/2006 | Fire Protective Equipment Discharge |
| SB146812C | 04/2010 | Forgery and Alteration |
| SB146813B | 01/2008 | Newly Acquired or Constructed Property |
| SB146814B | 03/2006 | Ordinance or Law |
| SB146815A | 01/2006 | Outdoor Trees, Shrubs, Plants and Lawns |
| SB146816A | 01/2006 | Pollutant Clean Up and Removal |
| SB146817A | 01/2006 | Preservation of Property |
| SB146818A | 01/2006 | Temporary Relocation of Property |
| SB146819A | 01/2006 | Water Damage, Other Liquids, Solder, Molten Damage |
| SB146820C | 06/2011 | Accounts Receivable |
| SB146821A | 01/2006 | Appurtenant Buildings and Structures |
| SB146822A | 01/2006 | Building Glass |
| SB146823B | 01/2008 | Business Income Extra Expense - Dependent Property |
| SB146824B | 01/2008 | Business Income Extra Expense-Newly Acquired Locs |
| SB146825C | 06/2011 | Business Personal Property Off Premises |
| SB146826B | 01/2008 | Civil Authority |
| SB146827F | 06/2011 | Electronic Data Processing |
| SB146828E | 04/2014 | Equipment Breakdown |
| SB146830B | 01/2008 | Money Orders and Counterfeit Paper Currency |
| SB146831B | 06/2011 | Nonowned Detached Trailers |
| SB146832B | 01/2008 | Ordinance or Law-Increased Period of Restoration |
| SB146833A | 01/2006 | Outdoor Property |
| SB146834A | 01/2006 | Personal Effects |
| SB146835A | 01/2006 | Signs |
| SB146836A | 01/2006 | Spoilage Consequential Loss |
| SB146837A | 01/2006 | Theft Damage to Rented Property |
| SB146838C | 06/2011 | Valuable Papers and Records |
| SB146839F | 06/2011 | Sewer or Drain Back Up |

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 4030940344 | 723 OCEAN FRONT WALK LLC |
| | 11543 W. OLYMPIC BLVD |
| | LOS ANGELES, CA  90064 |

## FORMS AND ENDORSEMENTS SCHEDULE

### COMMERCIAL PROPERTY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146936A | 01/2006 | Inflation Guard |
| SB147084C04 | 04/2012 | California Fungi, Wet Rot, Dry Rot, Microbe Exln |
| SB300129B | 01/2008 | Targeted Hacker Attack |
| SB300179G | 06/2016 | Choice Endorsement |
| SB300456A | 07/2007 | Concurrent Causation, Earth Movmnt, Water Excl Chg |
| SB300596A | 01/2008 | Identity Theft/Recovery Services Endorsement |
| SB300877B | 04/2014 | Building Owners Eco Choice Endorsement |

### COMMERCIAL GENERAL LIABILITY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146902G | 06/2016 | Hired Auto and Non-owned Auto Liability |
| SB146932F | 06/2016 | Blanket Additional Insured - Liability Extension |
| SB147079A | 01/2006 | War Liability Exclusion |
| SB147080A | 01/2006 | Exclusion - Silica |
| SB147083B | 07/2009 | Fungi/Mold/Mildew/Yeast/Microbe Exclusion |
| SB147088A04 | 01/2006 | Exclusion - Asbestos |
| SB147089A | 01/2006 | Employment - Related Practices Exclusion |
| SB147108B | 04/2014 | Limitation of Coverage to Designated Prem or Proj |
| SB300000D | 04/2014 | Businessowners Liability Coverage Form |
| SB300441A | 01/2007 | Fiduciary Liability Coverage Form |
| SB300449A | 01/2007 | Single Limit of Insurance Endorsement |
| SB300450A | 01/2007 | Employment Practices Liability Coverage Form |
| SB300849A | 07/2009 | Recd and Distribution of Material or information |

### *** PLEASE READ THE ENCLOSED IMPORTANT NOTICES CONCERNING YOUR POLICY ***

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| CNA62823XX | 07/2017 | Req For Jurisdictional Inspection Of Pressure Equp |
| CNA81758XX | 03/2015 | Notice - Offer of Terrorism Disclosure of Premium |
| CNA95404XX | 03/2019 | CNA Coverpage Form |



Countersignature

Chairman of the Board

Secretary

SB-146895-A (Ed. 01/06)                    INSURED                    Page   7 of   7

# EXHIBIT 3



**CNA Connect**

Endorsement Declaration

| POLICY NUMBER | COVERAGE PROVIDED BY | FROM - POLICY PERIOD - TO |
|---|---|---|
| B 4030940344 | CONTINENTAL CASUALTY COMPANY<br>151 N Franklin<br>CHICAGO, IL  60606 | 08/15/2020     08/15/2021 |
| | **INSURED NAME AND ADDRESS**<br>723 OCEAN FRONT WALK LLC<br>11543 W. OLYMPIC BLVD<br><br>LOS ANGELES, CA  90064 | |
| **AGENCY NUMBER**<br>052956 | **AGENCY NAME AND ADDRESS**<br>HANASAB INSURANCE SERVICES, INC.<br>625 S. FAIRFAX AVENUE<br>LOS ANGELES, CA  90036<br>Phone Number: (323)782-8454 | |
| **BRANCH NUMBER**<br>240 | **BRANCH NAME AND ADDRESS**<br>LOS ANGELES<br>WEDBUSH CENTER<br>1000 WILSHIRE BLVD 18 FL #1800<br>LOS ANGELES, CA  90017<br>Phone Number: (877)400-0750 | |

This policy becomes effective and expires at 12:01 A.M. standard time at your mailing address on the dates shown above.

This endorsement changes your policy.  Please read it carefully.

The Named Insured is a Limited Liability Company



| | | |
|---|---|---|
| The Endorsement Premium Is | $512.00 | ADDITIONAL |
| **Terrorism Risk Insurance Act Endorsement Premium** | **$17.00** | **ADDITIONAL** |

Audit Period is Not Auditable

| **CNA** | |
|---|---|
| | **Policy Holder Notice – Countrywide** |

# IMPORTANT INFORMATION

## NOTICE – OFFER OF TERRORISM COVERAGE;
## DISCLOSURE OF PREMIUM

**THIS NOTICE DOES NOT FORM A PART OF THE POLICY, GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

As used herein, 1) "we" means the insurer listed on the Declarations or the Certificate of Insurance, as applicable; and 2) "you" means the first person or entity named on the Declarations or the Certificate of Insurance, as applicable.

You are hereby notified that under the Terrorism Risk Insurance Act, as extended and reauthorized ("Act"), you have a right to purchase insurance coverage of losses arising out of acts of terrorism, as defined in Section 102(1) of the Act, subject to all applicable policy provisions. The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.

This Notice is designed to alert you to coverage restrictions and to certain terrorism provisions in the policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply.

CHANGE IN THE DEFINITION OF A CERTIFIED ACT OF TERRORISM

The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. Originally, the Act provided that to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States. However, the 2007 re-authorization of the Act removed the requirement that the act of terrorism must be committed by or on behalf of a foreign interest, and now certified acts of terrorism may encompass, for example, a terrorist act committed against the United States government by a United States citizen, when the act is determined by the federal government to be "a certified act of terrorism."



In accordance with the Act, we are required to offer you the ability to purchase coverage for losses resulting from an act of terrorism that is certified under the federal program. The other provisions of this policy, including nuclear, war or military action exclusions, will still apply to such an act.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The Department of the Treasury will pay a share of terrorism losses insured under the federal program. In 2015, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention, and shall decrease by 1 percentage point per calendar year until equal to 80%.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.



CNA81758XX (Ed. 03-15)          Copyright CNA All Rights Reserved.          Page 1 of 2



**Policy Holder Notice – Countrywide**

Further, this coverage is subject to a limit on our liability pursuant to the federal law where, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

CONFIRMATION OF ACCEPTANCE OF COVERAGE

In accordance with the Act, we offered you coverage for losses resulting from an act of terrorism that is certified under the federal program. This notice confirms that you have chosen to accept our offer of coverage for certified acts of terrorism. The policy's other provisions, including nuclear, war or military action exclusions, will still apply to such an act. The premium charge for terrorism coverage, if any, is shown separately on the Declarations or the Certificate of Insurance, as applicable.



**Policyholder Notice – Countrywide**

# IMPORTANT INFORMATION

## REQUEST FOR JURISDICTIONAL
## INSPECTION OF PRESSURE EQUIPMENT

Many states and some cities issue certificates permitting the continued operation of certain equipment such as boilers, water heaters and pressure vessels. Periodic inspections are required to renew these certificates. In most jurisdictions, as part of an equipment breakdown policy, insurance company employees who have been licensed are authorized to perform these inspections.

If:

- You own/operate pressure equipment that requires a certificate from a state, county, city or parish to operate legally, and
- We insure that equipment under this Policy, and
- You would like CNA to perform the next required inspection:

**Then:**

Complete the form on page 2 and email, mail or fax as instructed:

**No need to call or respond if you do not have boilers or pressure vessels that require operating certificates.**

**BY EMAIL:**       **EBinspections@cna.com** (please scan the completed form and attach)

**BY MAIL:**                                                                 **BY FAX:**        609-524-3649



CNA Equipment Breakdown Risk Control
184 Liberty Corner Road
4th Floor, Suite 402
Warren, NJ 07059                                          **BY PHONE:**     call 866-262-0540 – press "4"

Questions or inquiries can be made via any of the above methods of communication.

**Please note the following:**

- Your jurisdiction(s) may charge you a fee for renewing a certificate. It is your responsibility to pay such a fee.
- If CNA is required to pay the fee on your behalf, CNA will invoice you to recover that fee.
- All the provisions of the INSPECTION AND SURVEYS condition apply to the inspections described in this notice.

**Failure to notify us can result in fines and penalties being issued to the equipment owner by the governing jurisdiction. CNA is not responsible for said fines or penalties.**

### REMINDER

If new equipment is installed or old equipment replaced that requires a jurisdictional inspection, please let us know by transmitting the new information to the postal address/fax number/email address listed above and on the following page.

If this is a renewal and information (locations) has not changed, please disregard this notice.

If inspection and maintenance are outside of your area of responsibility, we would appreciate your forwarding this notice to the appropriate person. **If no response is received, we are assuming there are no jurisdictional objects at your location(s) and no inspections are required.**

**Note: Jurisdictional inspections are not conducted outside of the United States, its territories, possessions, or Canada.**



**Policyholder Notice – Countrywide**

## REQUEST FOR JURISDICTIONAL INSPECTION

| Insured Name: |
|---|

| Facility/Location Name: |
|---|

| Policy Number: | Policy Term: |
|---|---|

| Contact Person & Title: |
|---|

| Contact Phone Number(s)—Office: | Cell: |
|---|---|

| Contact Email Address: |
|---|

| Location Address[1] | City | State | Zip |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

| Equipment Type[2,3,4] <br><br> (Boiler, Pressure Vessel) | Registration Number (State #) | Certificate Expiration Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**Completed By (Name & Date):** _____

**Telephone #/Email Address:** _____

**BY EMAIL:**　　　　**EBinspections@cna.com** (please scan the completed form and attach)

**BY MAIL:**　　　　　　　　　　　　　　　　　　　　　**BY FAX:** 609-524-3649
CNA Equipment Breakdown Risk Control
184 Liberty Corner Road
4th Floor, Suite 402
Warren, NJ 07059　　　　　　　　　　　**BY PHONE:** call 866-262-0540 – press "4"

[1]If multiple objects and/or multiple locations, please list all required information on separate page(s).

[2]Boiler is defined as an enclosed vessel heated by fuel or electricity to produce steam or hot water.

[3]Pressure Vessel is defined as an enclosed vessel (tank) greater than 6 cubic feet (18 inches x 40 inches) to store liquid or gas under pressure for use when needed.

[4]LPG (ex: propane, propylene, butane & butylenes) Tank with vapor pressures not exceeding that allowed for commercial propane. California requirement only.

000527  8001 of 0001 - NNNNNN - 00527 JOBID 38072121771

CNA ATTN: CLAIM
801 WARRENVILLE RD
SUITE 700
LISLE                    IL 60532

000527
BEN SCHONBRUN
35 WEST 94TH ST. APT 2
NEW YORK   NY   10025




* To expedite handling of your claim, please include our claim number on all future correspondence to us.

| Insured/Client | | Claimant | | Claim Number * | | | |
|---|---|---|---|---|---|---|---|
| 723 OCEAN FRONT WALK LLC | | 723 OCEAN FRONT WALK LLC | | | ATT | W2 00121365 | |
| Date of Loss | Total WC Ind to Date | From - thru Dates | Suff/D/T | TRAN Code# | Exp | Pay Code# | Amount |
| 01/13/21 | | | 022 | 21 | | | 07/13/21 |
| | | | | | | | $178,065.24 |
| | | | | | | | $178,065.24 |

Reason
ADDITIONAL 3 MONTHS OF BI LOSS

To ensure timely delivery of your check, please verify that the address on this check is complete and correct. If not, please
notify your claims representative with the correct information. Thank you.

ACCWF 02.26.13

PLEASE DETACH BEFORE CASHING

CNA ATTN: CLAIM
801 WARRENVILLE RD
SUITE 700
LISLE                    IL 60532



000501
BEN SCHONBRUN
35 WEST 94TH ST., APT 2
NEW YORK NY 10025

* To expedite handling of your claim, please include our claim number on all future correspondence to us.

| Insured/Client | | Claimant | | | | Claim Number * | | W2 0012.13GS |
|---|---|---|---|---|---|---|---|---|
| 723 OCEAN FRONT WALK LLC | | 723 OCEAN FRONT WALK LLC | | | | | ATT | 05/03/21 |
| Date of Loss 01/13/21 | Total WC Ind to Date | From - thru Dates | Suff/Dt | TRAN Code# | EXP | Pay Code# | Amount | |
| | | | 022 | 21 | | | $252,901.92 | |
| | | | | | | | | |
| | | | | | | | $252,901.92 | |

Reason

SIX MONTHS BUSINESS INCOME LOSS DUE TO FIRE

To ensure timely delivery of your check, please verify that the address on this check is complete and correct. If not, please notify your claims representative with the correct information. Thank you.

CNA ATTN: CLAIM
801 WARRENVILLE RD
SUITE 700
LISLE        IL 60532



000502
BEN SCHONBRUN
35 WEST 94TH ST, APT 2
NEW YORK NY 10025



* To expedite handling of your claim, please include our claim number on all future correspondence to us.

Insured/Client: 723 OCEAN FRONT WALK, LLC

Claim Number: W2 00121365
ATT 05/03/21

| Date of Loss | Total WC Ind to Date | From - thru Dates | Claimant 723 OCEAN FRONT WALK, LLC | Suff/DT | TRAN Code# | EXP | Pay Code# | Amount |
|---|---|---|---|---|---|---|---|---|
| 01/13/21 | | | | 021 | 21 | | | $1,584,821.92 |
| | | | | | | | | $1,584,821.92 |

Reason
BALANCE OF BUILDING LIMIT DUE TO FIRE

To ensure timely delivery of your check, please verify that the address on this check is complete and correct. If not, please notify your claims representative with the correct information. Thank you.

PLEASE DETACH BEFORE CASHING

ACCWF 02.28.13

ACCWF 02.28.13

PLEASE DETACH BEFORE CASHING

To ensure timely delivery of your check, please verify that the address on this check is complete and correct. If not, please notify your claims representative with the correct information. Thank you.

Reason

BUILDING ADVANCE

* To expedite handling of your claim, please include our claim number on all future correspondence to us.

Insured/Client
7/23 OCEAN FRONT WALK LLC

| Date of Loss | | Claimant | | | | | Claim Number * | | |
| 01/13/21 | Total WC Ind to Date | 723 OCEAN FRONT WALK LLC | | | | | W2 00121305 | | |
| | From - thru Dates | Suff/DT | TRAN Code# | EXP | Pay Code# | ATT | 03/12/21 | Amount | |
| | | 021 | 21 | | | | | $200,000.00 | |
| | | | | | | | | $200,000.00 | |



000389
BEN SCHONBRUN
35 WEST 94TH ST., APT 2
NEW YORK  NY  10025

CNA ATTN: CLAIM
801 WARRENVILLE RD
SUITE 700
LISLE          IL 60532

CNA




ACCWF 02.28.13



CNA ATTN: CLAIM
801 WARRENVILLE RD
SUITE 700
LISLE                IL 60532



**CNA**

000398
BEN SCHONBRUN
35 WEST 94TH ST., APT 2
NEW YORK  NY  10025

* To expedite handling of your claim, please include our claim number on all future correspondence to us.

| Insured/Client | | Claimant | | | | | Claim Number * | | |
|---|---|---|---|---|---|---|---|---|---|
| 723  OCEAN FRONT WALK  LLC | | 723  OCEAN FRONT WALK  LLC | | | | | ATT | M2  00121310S | |
| Date of Loss | Total WC Ind to Date | From - thru Dates | Suff/DT | TRAN Code# | EXP | Pay Code# | Amount | 03/12/21 | |
| 01/13/21 | | | 022 | 21 | | | $100,000.00 | | |
| | | | | | | | $100,000.00 | | |

Reason
BUSINESS INTERRUPTION ADVANCE

To ensure timely delivery of your check, please verify that the address on this check is complete and correct. If not, please
notify your claims representative with the correct information. Thank you.

- - - - - - - - - - - - - - PLEASE DETACH BEFORE CASHING - - - - - - - - - - - - - -



P.O. Box 8317
Chicago, IL 60680

**Scott Benedict**
*National General Adjuster*
*Property Large Loss - Claim*
*Cell:      623 258-7515*
*Email:    scott.benedict@cna.com*

January 19, 2021

723 Ocean Front Walk LLC
11543 W. Olympic Blvd
Los Angeles, CA 90064-1508
Attn:  Mr. Benjamin Schonbrun

Re:       Claim Number:              W2001213
          Insured:                   723 Ocean Front Walk LLC
          Policy No.:                4030940344
          Date of Loss:              1/13/2021
          Loss:                      Fire
          Loss Location:             723 Ocean Front Walk, Venice, CA
          Underwriting Company:      Continental Casualty Company

Dear Mr. Schonbrun,

Continental Casualty Company ("CCC") has received, and begun its investigation, of the claim 723
Ocean Front Walk LLC ("723") has reported for fire damages at the location listed above on the stated
date of loss.

Please be advised that based on certain policy language and issues that have been identified, and that
we will discuss below, our investigation continues under a full Reservation of Rights.  You are hereby
notified that, by investigating this claim, CCC does not waive any of its rights or admit any obligation
under the policy of insurance issued to you bearing Policy Number 4030940344 with effective dates of
8/15/2020 – 8/15/2021.

CCC received this claim on January 13, 2021, the same day the loss occurred.  We made contact, and
discussed this loss with you the same day.  In our telephone conversation, you told us that 723 had a
single tenant, Snap, Inc.  You mentioned that Snap, Inc has not occupied this building for roughly 1 ½
years, however they have continued to pay their rent.

At this time, as we have advised, we have engaged a fire investigator and building consultant to assist
in our investigation of your claim.  We have also forwarded to you a copy of your insurance policy.

We would like to refer you to form SB-146801-I (Ed. 04-14), **BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM**, which states, in part:

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause Of Loss.

### 1. Covered Property

Covered Property includes Buildings as described under **a.** below, Business Personal Property as described under **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for the type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **A.2.** Property Not Covered.

**a. Buildings**, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed Additions;

(2) Fences

(3) Fixtures, including outdoor fixtures;

(4) Retaining walls, whether or not attached;

(5) Permanently installed:

(a) Machinery; and

(b) Equipment;

(6) Outdoor swimming pools;

(7) Personal Property owned by you that is used to maintain or service the building or structure or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings;

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(e) Lawn maintenance and snow removal equipment; and

(f) Alarm systems;

(8) If not covered by other insurance:

(a) Alterations and repairs to the building structure;

(b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making alterations or repairs to the building or structure.

## E. PROPERTY LOSS CONDITIONS

### 6. Vacancy

#### a. Description of Terms

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs (a) and (b) below:

    **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

    **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

        **i.** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

        **ii.** Used by the building owner to conduct customary operations.

  **(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

    **(a)** Vandalism;

    **(b)** Sprinkler leakage, unless you have protected the system against freezing;

    **(c)** Building glass breakage;

    **(d)** Water damage;

    **(e)** Theft; or

    **(f)** Attempted theft.

With respect to Covered Causes of Loss other than those listed in paragraphs **(1)(a)** through **(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

.......

Again, you have indicated that your tenant has not occupied this building for approximately 1 ½ years.

CCC requests the following information:

**1.** Documentation showing when the last day Snap, Inc occupied the building.

**2.** Documentation showing that Snap, Inc has continued paying rent to 723.

**3.** Utility records for the last 6 months.

**4.** Information or documentation showing what the interior of the building looked like. Did Snap, Inc have any personal or business property inside?

The purpose of this letter is to advise you that CCC will proceed with the investigation of this claim with a full reservation of all our rights and with the distinct understanding that no action heretofore taken by us on your behalf shall constitute an admission of coverage under the policy, nor as a waiver of any right to disclaim coverage under the policy for the aforementioned reason.

The above reference of certain policy language is not meant to be all inclusive. There may be additional policy limitations, provisions, exclusions or conditions that may apply.

3

We are making this Reservation of Rights not solely on the above-referenced policy conditions, but based on and in conjunction with all the terms and conditions of the above referenced policy. We reserve the right to amend this letter in the future.

If you have any additional information which we may not have or may not be aware of please provide this information to us at your earliest opportunity.

As always, if you have any questions or concerns relating to this claim, please feel free to call or to contact the undersigned to discuss.

Sincerely,

*Scott Benedict*

Scott Benedict
Continental Casualty Company

cc: Hanasab Insurance Services, Inc.

4

## Fwd: [EXTERNAL] 723 Fire claim

Benjamin Schonbrun <schonbrun.ben@gmail.com>
Sat 9/11/2021 2:05 PM
To: Ste yagman <1@yagmanlaw.net>

FYI


---------- Forwarded message ---------
From: **Benedict,Scott** <Scott.Benedict@cna.com>
Date: Fri, Sep 10, 2021 at 5:50 PM
Subject: RE: [EXTERNAL] 723 Fire claim
To: Benjamin Schonbrun <schonbrun.ben@gmail.com>


Ben,


As you have now filed suit against CNA and others, the claim has been transferred to a different unit.


**Scott Benedict**

National General Adjuster, Property Large Loss Claim
**CNA** | PO Box 8317, Chicago, IL  60680-8317

    Telephone:  623 258-7515

scott.benedict@cna.com


**From:** Benjamin Schonbrun <schonbrun.ben@gmail.com>
**Sent:** Friday, September 10, 2021 4:46 PM
**To:** Benedict,Scott <Scott.Benedict@cna.com>
**Subject:** [EXTERNAL] 723 Fire claim


Dear Scott,
I'm not sure what the attached letter from CNA is about. Are you no longer the adjuster handling my business interruption benefits claim? Please let me know how I should proceed.



PO Box 8317
Chicago, IL 60680-8317

**Christopher Weisel**
National General Adjuster
Chicago, IL
Telephone 215-805-9075

September 10, 2021

Facsimile
Email      Christopher.Weisel@cna.com

723 Ocean Front Walk LLC
11543 W Olympic Blvd
Los Angeles, CA 90064-1508

Claim Number:          W2001213      CW      Location Code:
Policyholder:          723 Ocean Front Walk LLC
Underwriting Co:       Continental Casualty Company
Line of Business:      Property
Date of Loss:          01/13/2021
Loss Description:      Insured property dmg due to fire due to not identified cause.
Policy Number:         4030940344

Dear Michael Seplow:

Please be advised that the above captioned claim has been transferred to me for further handling.

No action is needed by you at this time; however if you have any questions regarding this claim, feel free to contact me. If I need additional information, I will reach out to you.

Please use our claim number when corresponding with our office.

Sincerely,

CC:      Hanasab Insurance Services, Inc.

Christopher Weisel

CNAL0022

## Re: W2001213 // 723 Ocean Front Walk LLC

Info Information <Filing@yagmanlaw.net>
Tue 10/26/2021 8:07 AM
To: Weisel,Christopher <Christopher.Weisel@cna.com>

To Mr. Schonbrun.

---

**From:** Weisel,Christopher <Christopher.Weisel@cna.com>
**Sent:** Tuesday, October 26, 2021 7:35 AM
**To:** schonbrun.ben@gmail.com <schonbrun.ben@gmail.com>
**Cc:** Info Information <Filing@yagmanlaw.net>; Kahler,Christopher M <Christopher.Kahler@cna.com>
**Subject:** W2001213 // 723 Ocean Front Walk LLC

Mr. Schonbrun,

Thank you for reaching out about the above claim matter. I apologize for the delay in my response, but I needed to confer with counsel about this matter since we are both represented in this matter.

As of today's date Continental has paid through October for your business income loss. A supplemental payment for $57,740.80 for November can be issued but as you are represented by counsel we will need their direction as to where these supplemental payments should go. I have included your representation on this response for their advisement on this payment and the following business income payments until exhaustion.

We would prefer at this time to have a response from Mr. Stephen Yagman, your counsel, as to how this payment should be dispersed.

Thank you,

Christopher Weisel MBA, CPCU, SCLA, AIC-M
Litigation Consultant - Property and Marine Claims
CNA | PO Box 8317, Chicago, IL 60680-8317
Telephone: 215.805.9075
christopher.weisel@cna.com

This e-mail message, including any attachments and appended messages, is for the sole use of the intended recipients and may contain confidential and legally privileged information.
If you are not the intended recipient, any review, dissemination, distribution, copying, storage or other use of all or any portion of this message is strictly prohibited.
If you received this message in error, please immediately notify the sender by reply e-mail and delete this message in its entirety.

## Re: W2001213 // 723 Ocean Front Walk LLC

Info Information <Filing@yagmanlaw.net>
Tue 10/26/2021 8:07 AM
To: Weisel,Christopher <Christopher.Weisel@cna.com>

To Mr. Schonbrun.

---

**From:** Weisel,Christopher <Christopher.Weisel@cna.com>
**Sent:** Tuesday, October 26, 2021 7:35 AM
**To:** schonbrun.ben@gmail.com <schonbrun.ben@gmail.com>
**Cc:** Info Information <Filing@yagmanlaw.net>; Kahler,Christopher M <Christopher.Kahler@cna.com>
**Subject:** W2001213 // 723 Ocean Front Walk LLC

Mr. Schonbrun,

Thank you for reaching out about the above claim matter. I apologize for the delay in my response, but I needed to confer with counsel about this matter since we are both represented in this matter.

As of today's date Continental has paid through October for your business income loss. A supplemental payment for $57,740.80 for November can be issued but as you are represented by counsel we will need their direction as to where these supplemental payments should go. I have included your representation on this response for their advisement on this payment and the following business income payments until exhaustion.

We would prefer at this time to have a response from Mr. Stephen Yagman, your counsel, as to how this payment should be dispersed.

Thank you,

Christopher Weisel MBA, CPCU, SCLA, AIC-M
Litigation Consultant - Property and Marine Claims
CNA | PO Box 8317, Chicago, IL 60680-8317
Telephone: 215.805.9075
christopher.weisel@cna.com

This e-mail message, including any attachments and appended messages, is for the sole use of the intended recipients and may contain confidential and legally privileged information.
If you are not the intended recipient, any review, dissemination, distribution, copying, storage or other use of all or any portion of this message is strictly prohibited.
If you received this message in error, please immediately notify the sender by reply e-mail and delete this message in its entirety.

## RE: W2001213 // 723 Ocean Front Walk LLC

Weisel,Christopher <Christopher.Weisel@cna.com>

Mon 11/22/2021 5:16 AM

To: schonbrun.ben@gmail.com <schonbrun.ben@gmail.com>

Cc: Info Information <Filing@yagmanlaw.net>; Kahler,Christopher M <Christopher.Kahler@cna.com>

Mr. Schonbrun and Counsel,

I am following up on my prior correspondence from October 26th, listed below.  We wish to make further follow up payments under your business income coverage but require confirmation as to the location such payments should be sent as you are represented by counsel.  Please follow up with me directly and provide a response from your counsel as to whether or not these payments should be sent to their attention.

Thank you,

Christopher Weisel MBA, CPCU, SCLA, AIC-M
Litigation Consultant - Property and Marine Claims
**CNA** | PO Box 8317, Chicago, IL  60680-8317
Telephone: 215.448.3329
christopher.weisel@cna.com

---

**From:** Weisel,Christopher
**Sent:** Tuesday, October 26, 2021 10:35 AM
**To:** schonbrun.ben@gmail.com
**Cc:** filing@yagmanlaw.net; Kahler,Christopher M <Christopher.Kahler@cna.com>
**Subject:** W2001213 // 723 Ocean Front Walk LLC

Mr. Schonbrun,

Thank you for reaching out about the above claim matter.  I apologize for the delay in my response, but I needed to confer with counsel about this matter since we are both represented in this matter.

As of today's date Continental has paid through October for your business income loss. A supplemental payment for $57,740.80 for November can be issued but as you are represented by counsel we will need their direction as to where these supplemental payments should go.  I have included your representation on this response for their advisement on this payment and the following business income payments until exhaustion.

We would prefer at this time to have a response from Mr. Stephen Yagman, your counsel, as to how this payment should be dispersed.

Thank you,

Christopher Weisel MBA, CPCU, SCLA, AIC-M
Litigation Consultant - Property and Marine Claims
**CNA** | PO Box 8317, Chicago, IL  60680-8317
Telephone: 215.805.9075
christopher.weisel@cna.com

This e-mail message, including any attachments and appended messages, is for the sole use of the intended recipients and may contain confidential and legally privileged information.

If you are not the intended recipient, any review, dissemination, distribution, copying, storage or other use of all or any portion of this message is strictly prohibited.

If you received this message in error, please immediately notify the sender by reply e-mail and delete this message in its entirety.

## W2001213 // 723 Ocean Front Walk LLC

Weisel,Christopher <Christopher.Weisel@cna.com>

Tue 10/26/2021 7:35 AM

To: schonbrun.ben@gmail.com <schonbrun.ben@gmail.com>

Cc: Info Information <Filing@yagmanlaw.net>; Kahler,Christopher M <Christopher.Kahler@cna.com>

Mr. Schonbrun,

Thank you for reaching out about the above claim matter. I apologize for the delay in my response, but I needed to confer with counsel about this matter since we are both represented in this matter.

As of today's date Continental has paid through October for your business income loss. A supplemental payment for $57,740.80 for November can be issued but as you are represented by counsel we will need their direction as to where these supplemental payments should go. I have included your representation on this response for their advisement on this payment and the following business income payments until exhaustion.

We would prefer at this time to have a response from Mr. Stephen Yagman, your counsel, as to how this payment should be dispersed.

Thank you,

Christopher Weisel MBA, CPCU, SCLA, AIC-M
Litigation Consultant - Property and Marine Claims
**CNA** | PO Box 8317, Chicago, IL  60680-8317
Telephone: 215.805.9075
christopher.weisel@cna.com

This e-mail message, including any attachments and appended messages, is for the sole use of the intended recipients and may contain confidential and legally privileged information.
If you are not the intended recipient, any review, dissemination, distribution, copying, storage or other use of all or any portion of this message is strictly prohibited.
If you received this message in error, please immediately notify the sender by reply e-mail and delete this message in its entirety.